# ANONYMOUS.*

*New York Superior Court ; before Hon. Murray Hoffman, Referee, September, 1862.*

DIVORCE.—ADULTERY.—EVIDENCE.—WITNESS.—CREDIBILITY.— INTEREST.

Adultery committed by the plaintiff is a perfect defence to an action for an absolute divorce, and is also a ground for affirmative relief in the same action.†
The testimony of a witness employed to watch and detect a husband or wife suspected of adultery, though it is competent, and ought not to be absolutely rejected, is to be received with great caution, and scrupulously and minutely scrutinized.

---

* This cause was very earnestly and thoroughly litigated upon the questions on which it turned ; and although it was tried, and the opinion prepared, by Judge Hoffman, while sitting in the capacity of referee, after he had left the bench of the Superior Court, it is deemed not the less valuable as an exposition of the law by so able a hand.

The report of the referee, made in accordance with this opinion, was confirmed by the court ; and judgment was entered thereon in November, 1862, and notice of its entry given ; but no appeal was taken.

† In McNamara *a.* McNamara (9 *Ante*, 18), it was *Held*, that in an action for a limited divorce, the defendant may interpose a demand for a like decree against the plaintiff. But in Diddell *a.* Diddell (8 *Ante*, 167), and in Griffin *a.* Griffin (23 *How. Pr.*, 183), it was *Held*, that in an action for an absolute divorce, on the ground of adultery, the defendant could not interpose a demand for a limited divorce for cruel and inhuman treatment. (See, also, Linden *a.* Linden, 36 *Barb.*, 61.)

Bad repute of a witness in former years, of such a degree as to destroy his credibility, is treated as continuing, until, by the production of full evidence, a change of reputation from change of conduct is shown.

In averring the offence, in an action for divorce on the ground of adultery, precision as to time, place, and circumstances is required.

Examples of sufficient and insufficient averments in this respect.

Evidence of adultery in an action of divorce must accord with the allegations of such offence in the pleadings.

The fact that a witness is a prostitute, and the keeper of a house of ill-fame, does not warrant an entire rejection of her testimony; but a conviction of adultery should not be founded on facts established by her evidence solely.

So, where the circumstances as to which she is corroborated do not inevitably lead to the conclusion that adultery has been committed, her testimony is insufficient.

Proof of two or three visits to a brothel, by a husband, unaccompanied by a woman, is not sufficient evidence of adultery to authorize a divorce.

While to authorize a divorce for adultery, direct proof of the actual commission of the crime is not required, yet the proximate facts must lead by a fair inference to a necessary conclusion, a conclusion so far inevitable that the supposition of innocence cannot by any just course of reasoning be reconciled with it.

## Trial by Referee.

This action was brought by a husband to obtain an absolute divorce from his wife, on the ground of alleged adultery on her part. The answer denied the adultery and charged the plaintiff with the commission of the like offence, and claimed judgment in favor of the defendant for a dissolution of the marriage contract on the ground of adultery. The pleadings were verified. The issues were referred by consent to Hon. Murray Hoffman, to hear and determine. The evidence taken before him sufficiently appears from the opinion.

*William C. Traphagen* and *Jas. T. Brady*, for the plaintiff.

*John L. Sutherland* and *L. B. Woodruff*, for the defendant.

MURRAY HOFFMAN, Referee.—The investigation of this interesting case will be conducted under two leading heads. *First*, upon the case made under the plaintiff's complaint as to the adultery of the defendant; *second*, upon the defendant's recriminating charges of adultery committed by the plaintiff. The last, if established, serves not merely as a perfect defence to the plaintiff's action, but will afford a ground for the affirmative relief asked for in the answer.

I consider the decision of Justice Bosworth, in the case from 11 *N. Y. Leg. Obs.*, 350 (B. *a.* B.), as sufficient, if not decisive authority for this last proposition; it is also sustained by reasoning entirely satisfactory.

I. Upon this first issue, I shall examine the direct evidence given by the plaintiff; what it proves, assuming it to be credible; and what portion of it is credible or otherwise.

W., the leading witness, swears directly and positively to the following facts, of which he made memoranda at the time. That the defendant and Y., her alleged paramour, were in his room or her room many times, and at late hours of the night, till twelve o'clock and later. On one particular night, between twelve and one o'clock, he saw Y. come out of her room with nothing but his night-shirt on; was without drawers. On another occasion, he was in bed and sick. She was partly on the bed kissing him, her breast was on his. On another night, about one o'clock, he saw Y. go into her room, with nothing on but his night-shirt, that he could see. He heard the bed move as if there was some action upon it. Other instances are mentioned by him of a similar nature: and he says that on these occasions, at such late hours, they were alone.

If these statements came from a credible witness, who had escaped a severe cross-examination without inconsistency in material matters; and brought to the stand an unblemished character, they would need very little, if any, corroborating evidence, to justify a sentence for the plaintiff.

But W. was hired as a spy to watch the conduct of the de fendant; to supply the testimony necessary for the plaintiff's purpose. There is no legal evidence that the plaintiff employed K., who employed W. I could scarcely resist the presumption that he did so, if it were essential to make it; but I consider it unimportant.

Whatever discredit properly attaches to the witness, results from his engaging in this employment for money; impelled by an irresistible impulse to serve his employer, earn or increase his compensation, and with the reward depending on success.

But a case within my own knowledge, where a clergyman was entrapped into a marriage with a harridan, whose cunning was equal to her infamy, and drove him to use similar means

as the only mode of extrication, has taught me that crime may remain wholly undetected, if evidence from such a source be disregarded. And the only rule can be, that the judge should give the most scrupulous and minute consideration to every thing that is stated by such a witness. These observations are confirmed by Dr. Lushington, in Ciocci *a.* Ciocci (26 *Eng. L. & Eq. R.*, 604, 613).

I do not find that the cross-examination of W. has shaken his testimony. I have not found any thing of contradictions or inconsistencies from his own lips to impair his own statements, and this test of truth has failed to prove him false or unreliable.

But his character for truth and veracity has been most seriously impeached. It is an inevitable conclusion, that if the character he maintained in Connecticut is to be adopted as the test, he is utterly unworthy of credit. In my experience, I never met with a case in which the trustworthiness of a witness was more effectually destroyed. Nor can I think that it would be unjust or illogical to presume, that the repute then earned must be treated as continuing, until full evidence is produced of a change of reputation from a change of conduct.

But besides this, some testimony proves that there has been no change or reformation since his removal to New York.

The evidence to repel all this, and support his character, is very slight. With but one exception, it comes from persons who never heard any common acquaintance speak of his character. They give their own opinions. The exception I refer to is that of a witness whose evidence is of little weight.

I cannot then but say, that this witness brings to the stand a reputation so successfully assailed for truth, that I may not rely on his testimony at all. I must strike it from the case, and must find ground for the judgment sought by the plaintiff as if it had never been given.

The next witness to support the plaintiff's case is J. M. B.

I have read and reread his testimony with great care. I need not give it in detail, or in substance. My conclusion is, that standing alone, it would be plainly insufficient to establish guilt. That it might by itself alone prove a suspicious intimacy, and in minor yet pertinent matters tend to corroborate W.'s, is not to be disputed. But by itself, it never could warrant a judgment for the plaintiff.

The witness is open to the same tinge of discredit as W., from being hired to watch the defendant.

The witness denies stating to two other persons his ignorance of any thing tending to prove the defendant guilty. Both of these parties contradict him.

I conclude that the plaintiff's case is not made out by the testimony on his behalf, without any reference to the defendant's evidence, other than as it relates to the general reputation of W., and the contradictions of B.

But when the defendant's direct evidence is considered, the pointed testimony of Y., who, I think, is entitled to belief, and the corroboration of others, the result seems inevitable that the plaintiff has wholly failed in his case.

II. I come now to the far more difficult part of the case—the allegation, in the answer, of the plaintiff's criminality.

The statements in the pleadings must first be noticed.

The offences are first charged in the fifth article, in general terms, as having been frequently committed since the marriage, with persons unknown and at places which the defendant cannot specify. *Next*, it is averred that between the first of May, 1860, and the first of November, 1861, the defendant was a frequent and regular visitor at No. 52, in a designated street, a house kept by Ann Richards for the purposes of assignation and prostitution.

That the plaintiff visited such house for the purpose of having illicit intercourse with one or more females whose names are unknown, and did, during such period, commit adultery with one or more females whose names are unknown, "and at the particular times and under the particular circumstances specified in the seventh and eighth paragraphs of this answer; and at various other times during said period, at said house, which this defendant is unable to specify, and with one or more females whose names are unknown to this defendant."

The seventh paragraph is, "that the plaintiff, on the first or second Saturday of October, 1860, committed adultery with a female whose name is not known to this defendant, at the house known as number fifty-two in said street, in the city of New York, between the hours of three and five o'clock in the afternoon; and that on the day aforesaid said house was kept as a house of prostitution or assignation."

And the eighth paragraph is, "that as this defendant has been informed and believes, the plaintiff, on the Wednesday succeeding the first or second Saturday of October, 1860, committed adultery with a female whose name is not known to this defendant, in the house known as street-number fifty-two, in said street, in the city of New York, between the hours of three and five o'clock in the afternoon, and that on the day aforesaid said house was kept, as a house of prostitution and assignation."

Rejecting the allegation in the fifth article as entirely too vague, we have three allegations in the answer: 1st. The specific charge of the offence being committed on the first or second Saturday of October, 1860; 2d. The specific charge of the offence on the Wednesday succeeding such Saturday; and 3d. The charge of the commission, at the same place, at various other times, during the period from the first of May, 1860, to the first of November, 1861, and all with persons unknown.

The rule as to precision in averring the offence, as to time, place, and circumstance, is strongly stated by Chancellor Walworth, in Wood a. Wood (2 *Paige*, 108), and the history of the case of Germond a. Germond, there cited, is a striking example of the danger of allowing laxity of allegation in the material particulars of time, &c.

See, also, Walton a. Walton (32 *Barb.*, 203; S. C., *sub nom.* Anonymous, 11 *Abbotts' Pr.*, 231), as to suits for separation; and see the valuable remarks of Dr. Lushington on the maxim, *secundum allegata et probata*, as applicable to such cases, in Eaton a. Eaton (7 *Notes of Cases in Ecc. Courts*, 1–27).

In examining the evidence, with the allegation to which it can apply always in mind, I am satisfied that the testimony I admitted of Margaret Roberts ought not to have been received. A motion was made to strike it out, which was denied. I shall now grant it, and give the other side the opportunity to except, or take such other course as may be advised.

Her testimony goes first to prove the plaintiff's visiting Mrs. Willard's, a house of ill-fame, at a designated place in Sixth Avenue; she fixes this in her direct examination as in August, 1861. I pass over the subsequent contradictory statement which fixes her residence in another street at that time. She next testifies as to what took place on a steamboat, going up

the North River in the summer of 1860, where the plaintiff was in the society of Mrs. Willard and the witness.

I think there can be no view in which the allegations of the complaint will warrant this testimony.

Anna Richards is the first material witness. If credible, she proves frequent visits, by the plaintiff, to her house of assignation, No. 52 —— street; bringing women with him, and their occupying a private room for a half-hour to an hour.

I do not think that her being a prostitute, and keeping a house of ill-fame, warrants an entire rejection of her testimony; but it does warrant a refusal to found a conviction of guilt on her evidence solely. Clear corroboration in an essential particular must be made out. Vice-chancellor McCoun, in Turney a. Turney (4 *Edw.*, 566), would not grant a divorce upon the evidence of two prostitutes. There was, however, also suspicious conduct on the part of the plaintiff. (See, also, Banta a. Banta, 3 *Edw.*, 295.)

And I understand the court, in Ciocci a. Ciocci (26 *Eng. L. & Eq. R.*, 604, 618), distinctly to hold the proposition, that the evidence of a prostitute standing alone is not sufficient.

Nor am I satisfied that I can wholly discard her evidence, on the ground of the testimony generally discrediting her for truth and veracity.

She is discredited strongly by what she says as to the explanation of the object of the parties coming to her house, and as to the very marked circumstances connected with the $50. She forgets that she received a package about that time of $50 from Captain Speight. But the captain deposes to his own opportune voluntary loan of that sum. She denies that she asked Hyatt to loan her money. He says she asked him for a loan of $50.

The circumstances of the transaction as to this $50, leave a deep impression upon my mind, that the witness was led to depose under the influence of this generous loan; that she cunningly denied its reception (her forgetfulness is almost incredible), from a consciousness of the effect of the disclosure, and that she "is as willing to bring her testimony to market, as to offer her person for sale."

I feel warranted in concluding that her evidence must not be relied upon to establish any material fact.

And here it is to be remarked, upon the point of corroboration, that while she swears to frequent visits, she is positive that the plaintiff always brought a female with him, and to her recollection, never went into a private room with any female but such as he brought. We have both Lavender and Buttrick swearing, that when they saw him enter, he was alone.

Now if the mere fact, assumed to be established by the witnesses, of two or three visits to the house alone, is insufficient to found a decree upon, then the evidence of Richards becomes essential to prove adultery. She, and she alone, swears to the plaintiff's retiring to a private room with females. Hence a decree must rest substantially on her testimony; without it, on the hypothesis presented, the adultery is not proven.

I do not understand that the doctrine of corroboration of a witness, strongly discredited, covers such a case. Confirmation as to the mere fact of entering the house, does not support her credibility as to the fact of actual adultery; or the proximate evidence of it, by retiring to a private room with a prostitute for an hour. I consider that the confirmation must be to the essential point on which the case depends.

And thus in either view, that of absolutely excluding the evidence of Richards, or demanding clear corroboration from others to admit it, the case must be decided by other testimony.

*Second.* How does it stand upon the evidence of Lavender and Buttrick?

The evidence of Lavender is positive that he saw the plaintiff go into No. 52, on two occasions, the 6th of October, and the Wednesday ensuing. A person had been pointed out to him as the plaintiff by Meredith, when he was employed to watch the house. He had seen him but once before: he recognized him as entering the house. He swears that he recognized the plaintiff as the same person, in March ensuing. Saw him come out of his own house, and is positive as to the identity. On the trial, the plaintiff being present, he swears also to the identity of the persons.

On these two occasions the plaintiff had not a lady with him.

I give but little weight to the statement as to the color of the dress and gloves, as to which a great deal of testimony for the purpose of proving this witness mistaken, has been produced.

The testimony of Buttrick is explicit, that in October or

November, 1860, he saw the plaintiff enter the house, No. 52. He saw him from No. 47, on the opposite side of the way. He was alone. The attempt to show that in the position he occupied he could not have seen what he states, has failed.

I consider it then to be proven that, on two occasions, the plaintiff entered the house No. 52, a house of ill-fame and assignation. I assume that he knew its character. It is, perhaps, a just inference that he went there three times. Yet this is not clear. Buttrick assigns October or November for the visit he saw. It may be that this was one of the occasions Lavender deposes to, as taking place in October. In each case he went in alone; no woman was with him.

I have then, on this deduction from the testimony, to deal with this proposition: Can a conclusion of adultery be founded solely upon the fact of a man being shown to have gone unaccompanied three times into a house of ill-fame, in the afternoon and daylight? The question is of interest and delicacy.

The aphoristic phrase has been quoted, that men do not go into brothels to say their *pater noster*. Let us examine to what extent this phrase indicates a rule of judicial decision.

Lord Stowell uses it in Loveden *a.* Loveden (2 *Hagg. Cons. R.*, 1). He speaks of it as an old saying; and that it is impossible persons could have gone to such places for any but improper purposes, and that it was universally held a proof of adultery.

This language is used in illustration of an argument as to the weight of proof of certain letters in the cause. Nothing in the case called for a decision upon the point, so as to have awakened the luminous judicial mind of that judge to caution in the use of language.

In Astley *a.* Astley (1 *Hagg.*, 74), the facts of the case were these: The evidence proved that the husband conversed with courtesans on a public race-course, and took a licentious liberty with the dress of one of them; that he promised to treat them if he won the race; that he was on the same evening at a brothel, knowing the character of the house before he went, and that at such house, he went up stairs with a prostitute, and remained alone with her, at least a quarter of an hour.

Dr. Lushington, after stating these facts, and holding them amply sufficient to raise the presumption of adultery, cites Elliot *a.* Elliot (mentioned by Lord Stowell, in Williams *a.* Williams,

1 *Cons. R.*, 302), as deciding that a woman's going to a brothel with a man furnishes conclusive proof of adultery. He expresses the opinion, that the rule should be the same as to a man; but, at any rate, it furnished a violent suspicion; to be rebutted, if it can be at all rebutted, by the very best evidence.

Popkin *a.* Popkin (1 *Hagg.*, 733, *n.*) is also cited. But there is nothing upon the subject, except that the libel alleged the habitual frequenting of brothels, and associating with common prostitutes.

In Williams *a.* Williams (1 *Hagg. Cons. R.*, 299), the case of Elliot *a.* Elliot is also quoted. It is quite clear that Sir William Scott assumes that the character of the house was known to the woman. He says: "It is almost impossible that a woman would go to such a place, except for a criminal purpose."

In Best *a.* Best (1 *Addams*, 411–437), there was positive proof of the woman and the *particeps criminis* going into a house of ill-fame, with the mistress of which the woman was acquainted.

In Kenrick *a.* Kenrick (4 *Hagg.*, 114), a witness, who was credited by the court, saw the wife (the defendant) go with a man into a brothel. Sir John Nichols said, "This goes far, with other circumstances, to establish adultery."

In Wood *a.* Wood (4 *Hagg. Ecc. R.*, 138), the woman was watched into a house of ill-fame, and here she met the alleged *particeps* several times.

Van Epps *a.* Van Epps (6 *Barb.*, 320), there is merely the statement by the learned judge of the general rule expressed by Lord Stowell, in illustration, and for the enforcement of his views of the evidence.

In Langstaff *a.* Langstaff (*Wright's Ohio R.*, 148), it was shown that the husband was frequently at a house of ill-fame, and had been seen on a bed with common prostitutes.

And in Betts *a.* Betts (1 *Johns. Ch.*, 197), a witness testified that he had been at a house of ill-fame once or twice with the defendant, but did not stay long; that he never saw the defendant alone with any woman at such places, nor did he know that he slept at such house, or that he had criminal intercourse with any one. The chancellor said, "He being once or twice in a house of ill-fame, in the manner stated, was too slight and equivocal a circumstance to supply the defect of other proof."

In this case, at least, the presumption arising from being in a house of ill-fame was repelled by the ignorance of the witness as to intercourse with a woman there, or of the parties having slept there.

This review of the authorities shows quite clearly that it has not been decided in any of them, that the conclusion of guilt is to be deduced from the naked fact of two or three visits to a brothel, unaccompanied by a woman.

The general rules as to the degree and nature of the evidence demanded, are too well known to justify a statement in detail. While direct proof of the actual commission of the crime is not required, yet the proximate facts must lead by a fair inference to a necessary conclusion. This is not a necessary conclusion in a strictly mathematical or logical sense. The subject and the conditions of the evidence do not admit of this. But it must be a conclusion, so far inevitable, as that the supposition of innocence cannot, by any just course of reasoning, be reconciled with it. (Rix *a.* Rix, 3 *Hagg. Ecc. R.*, 74 ; Cadogan *a.* Cadogan, 2 *Hagg. Cons. R.*, 6, *note;* Loveden *a.* Loveden, *Ib.*, 1 ; Williams *a.* Williams, 1 *Ib.*, 299 ; Dunham *a.* Dunham, 6 *Law R. (Mass.)*, 139 ; Van Epps *a.* Van Epps, 6 *Barb.*, 320.)

I have studied the evidence in this case with all the care I can exercise. I have examined the testimony in a multitude of leading authorities upon the subject. I find no case in which a judgment of divorce has been pronounced upon facts so slight as the sifted testimony in the present instance affords. Whatever suspicions exist in my mind; whatever results my own individual views may deem most probable, I cannot judicially say that the plaintiff has been guilty as alleged. The formula of a Scottish verdict, *not-proven*, expresses my conclusion.