JOSEPH W. DURYEA, Respondent, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Appellant.

*Action for wrongfully discharging water upon another's lands — the recovery must be limited to the damages sustained prior to the commencement of the action — When a claim must be presented to the Comptroller, under chapter 379 of 1860, before an action lies against the city — Grant of land under water in New York — what restrictions are imposed by the ordinances upon the grantee — he is chargeable with knowledge of the limitations imposed upon the power of the officers.*

In an action brought to recover the damages occasioned by the wrongful acts of one who has discharged water and sewage upon the lands of another, no recovery can be had for damages occasioned by the discharge of the water and sewage upon the land after the commencement of the action.

Such damages, when occasioned by the wrongful acts of the city of New York, are within the provisions of chapter 379 of 1860, providing that no action can be maintained against the city until after the lapse of twenty days from the time the claim has been presented to the comptroller for adjustment; and in an action brought against the city to recover such damages, the recovery must be limited to the damages occasioned at the time of the presentation of the claim to the comptroller.

An ordinance of the city of New York, approved February 22, 1844, relating to the granting of land under water, provided that no such grant should authorize the grantees to construct bulkheads or piers, or make land in conformity thereto, without permission having been first had and obtained from the common council. By chapter 225 of 1845 this ordinance was sanctioned and continued in force.

*Held*, that the passage of the act of 1845 gave to the ordinance the effect of legislative authority.

That even if this were not so, yet, as the ordinance was passed under the authority conferred by the city charter, it was obligatory upon all subsequent grantees, and those deriving title from them.

That the ordinance abridged the power of the city officials to convey land under water, and prevented a deed from so operating as to confer a title upon the grantee, which would allow him to fill in the land without the consent of the common council, even though no restrictions were contained therein.

That the grantee was chargeable with notice of the restriction imposed upon the city officers making the conveyance, and could acquire no greater rights than their authority allowed them to create or convey.

That when such a grantee had, without first obtaining the consent of the common council, built a bulkhead and filled in such lands, he could not recover from the city the damages occasioned by its having discharged water and sewage upon the said land, thereby washing it away and injuring the bulkhead.

*Duryea* v. *The Mayor* (62 N. Y., 592, and 2 Hun, 293) distinguished.

Appeal from a judgment in favor of the plaintiff, entered upon a verdict directed at the circuit.

*Francis Lynde Stetson*, for the appellant.

*A. J. Vanderpoel* and *F. J. Fithian*, for the respondent.

Daniels, J. :

The recovery was for the damages sustained by the plaintiff by water and other substances, discharged from the Thirty-fourth street sewer, in the city of New York, washing out earth filling, and a bulk-head placed and constructed by the plaintiff upon land conveyed to him by George F. Talman, who had previously derived his title under a deed made by the defendant to the Farmers' Loan and Trust Company. The original deed was dated on the 29th day of January, 1847, while the conveyance to the plaintiff was made on the 1st day of February, 1866. At the time when the deed was made to the company, the land described in it was situated upon the easterly side of Manhattan island, below high-water mark and under the water of the East river. And when the plaintiff acquired his title to the portion of the same premises upon which the injury is alleged to have taken place, that also was still under the water of the river. Before he derived his title the sewer in question had been constructed and a side-cut extended in a northerly direction from it, terminating at a point near the plaintiff's southerly line. From that point the water was discharged in such a manner as to send it over the land conveyed to the plaintiff. After he had acquired title to this land and principally in the years 1867, 1868, and the early part of 1869, he procured large quantities of earth to be deposited in the water for the purpose of bringing the land above its surface, and in that manner rendering it useful to himself. For the same purpose he constructed a bulkhead along the easterly end of the land upon what was known as the commissioners' bulkhead line, and he also constructed a similar bulkhead upon the northerly side of the property conveyed to him. By the water and other substances discharged from the point where the side-cut of the sewer terminated, and which was from there sent in large quantities over his premises, a part of the filling made by him, as well as the bulk-

head on the northerly side of his land, were carried out, and the same became lost to the plaintiff in the action.

The suit was commenced on the 7th day of October, 1869, for the recovery of the damages sustained in that manner. Upon the trial of the action the court was asked to restrict the plaintiff in his recovery to the losses which had at that time been sustained by him, or to such a sum as appeared to be sufficient to compensate him for the losses originating in what up to that time had taken place. The court declined to adopt that view and allowed the plaintiff to recover for such losses as had been caused by the discharge of the water from the sewer upon his premises down to the years 1870 and 1871. And to the rulings allowing such a recovery exceptions were taken by the defendant. From the statement which was made to the jury of the several items of damages claimed by the plaintiff, the fact is also indicated that they must have allowed the plaintiff to recover for losses produced by the discharges made from the sewer and passing over his premises after the time when the action was commenced.

As the discharges flowed from the sewer upon the plaintiff's property they constituted a nuisance, and for that nuisance a distinct and separate action might have been brought by him for every discharge made by the sewer upon his property. Each discharge was, in and of itself, a substantive cause of loss, and for that reason constituting a separate right of action. If the cause of the plaintiff's injury had terminated before the time when the suit was commenced then he might properly have been permitted to recover all the damages occasioned by such cause, for they would be incidental only to the right of action arising out of the wrong itself which had previously been consummated. But inasmuch as the wrong was repeated after the action was commenced, the portion of the damages originating in that wrong formed the subject-matter of a distinct action by themselves and could not properly be allowed to enter into the verdict in this case. As to wrongs of this nature their continuance has been uniformly held to be an additional nuisance, forming of itself the subject-matter of an action. (*Vedder* v. *Vedder*, 1 Denio, 257; *Brown* v. *Cayuga, etc., R. R. Co.*, 2 Ker., 487, 492; *Warner* v. *Bacon*, 8 Gray, 397, 402: *Phillips* v. *Terry*, 3 Keyes, 313; *Bare* v. *Hoffman*, 79 Penn., 71; *Duncan*

v. *Markey*, Harper [S. C.], 276.) And for that reason, only such damages could be recovered for the causes alleged in the complaint as the ground of action, as originated solely from that source before the commencement of the action. (*Blunt* v. *McCormick*, 3 Denio, 283.) Neither the case of *Tilley* v. *Hudson River Railroad Company* (29 N. Y., 252), nor those of *Ludlow* v. *Village of Yonkers* (43 Barb., 493) or *New York Guaranty, etc., Company* v. *Flynn* (55 N. Y., 653), support any different conclusion. The first was brought for a loss sustained by the wrongful killing of the plaintiff's wife; and whatever that loss may have been was wholly attributable to the act forming the exclusive foundation of the action itself. It all originated in that cause. The same observation is equally applicable to the case secondly referred to, for there the damages were produced by the falling of a wall, and whenever they accrued they were traceable solely to that circumstance. And in the last of these cases the interest allowed to be recovered was upon the value of the property of which the plaintiff had been deprived by a wrong wholly perpetrated before the commencement of the action. The same observation may also be made concerning the case of *Wilcox* v. *Plummer* (4 Peters, 172), which, in the opinion that was given, was distinguished from a controversy of this nature where the nuisance of to-day is stated to be a substantive cause of action, and not the same as the nuisance of yesterday. It is clear under the force, as well as the language of these authorities, that no recovery should have been permitted in the case, beyond the amount that appeared to be sufficient to indemnify the plaintiff for the loss and injury sustained by him in consequence of the discharge from the sewer passing over his premises before the 7th day of October, 1869.

Even this rule would probably be more liberal to the plaintiff than he had any right to insist upon for the determination of the extent of his loss, for by chapter 379 of the Laws of 1860, no action whatever was allowed to be prosecuted or maintained by him against the defendant until after the lapse of twenty days from the time his claim should be presented to the comptroller of the city for adjustment; and not then, unless it should further appear that upon a second demand in writing being made upon the comptroller, after the expiration of the twenty days, he neglected or refused to make an adjustment or payment of the same. This prohibition

was made so broadly as to include the plaintiff's claim, and it was necessary for the purpose of maturing a right of action upon it that the requirements of the statute should appear to have been observed. And to show a compliance with these provisions it was alleged in the complaint that the claims the plaintiff then made were so presented on the 20th day of August, 1869. The failure of the comptroller to adjust or make payment of the claims when the final demand in writing was made upon him, authorized the plaintiff to prosecute his action for the recovery of such claims, and that was the utmost extent of the right arising out of these circumstances. A claim for subsequently accruing losses, occasioned by the discharges from the sewer being continued after that time, was the subject-matter of other and different causes of actions from those so presented to the comptroller. And under the provisions of this statute they could not form the foundation of a recovery against the city, until they themselves had been so presented, and payment of the amount had been refused. This is the clear and obvious effect of the statute, and it accordingly entitled the defendant to the instruction that the plaintiff was not entitled to recover damages occurring subsequent to August 20, 1869.

Exceptions were also taken to the direction of the court, that the plaintiff was entitled to recover interest upon the losses sustained by him. But under the authority of *Parrott* v. *Knickerbocker, etc., Ice Company* (46 N. Y., 361, 369), these exceptions cannot be sustained.

Under the deed which was executed and delivered to the Farmers' Loan and Trust Company, and through which the plaintiff derived his title, it was held by the Court of Appeals, in *Duryea* v. *Mayor, etc.* (62 N. Y., 592), that he had the right to fill in this land, and construct the bulkhead on the northerly side of it, because he had acquired the legal title to the property. And by that ruling the decision in *Duryea* v. *Mayor, etc.* (2 Hun, 293), in which a different construction had been given to the terms of the deed, was reversed. If the case were now presented as it was then made to appear, the construction finally given to the deed would authorize a recovery by the plaintiff. But upon the last trial of the action, certain sections of an ordinance enacted by the common council of the city of New York, and approved February 22, 1844, were produced in evidence. And by their terms the case appears to be now distin-

guishable in its circumstances from the manner in which it was presented upon these preceding occasions. The deed to the Farmers' Loan and Trust Company was executed under the authority of this ordinance, which provided that a grant of land under water, as this was, should only be made after a report by the comptroller and street commissioner to the commissioners of the sinking fund, stating the sum of money which should in their judgment be charged as a consideration for the grant, and only then in case a majority of the commissioners should agree to the terms so reported. It was further provided by this ordinance that no such grant should authorize the grantee to construct bulkheads, or piers, or make land in conformity thereto without permission so to do was first had and obtained from the common council. By chap. 225, Laws of 1845, this ordinance was sanctioned and continued in force. The language of the act in substance is, that the ordinance in force, and approved by the mayor of said city on the 22d day of February, 1844, and any other ordinance afterwards passed in conformity with the provisions of this act, and relative to the sinking fund mentioned in it, should not be amended without the consent of the legislature first had and obtained. "And the said ordinance" it was further provided should "remain in full force, until the whole of the debt, created for the introduction of the Croton water into the city of New York should be fully redeemed." (Laws of 1845 225, § 5.) It was not merely so much of this ordinance as directly related to the sinking fund which the legislature provided should not be amended without its consent, but the entire ordinance was made the subject of the act. It was referred to in terms admitting of no other construction. Those terms, "the ordinance," and "said ordinance," which by their proper signification were adapted to no other construction than that they were designed to include the entire ordinance, and the act consequently gave it the effect of legislative authority. But even if this act should be so construed as not to include this section of the ordinance, its effect would still be the same, for it is to be assumed to have been adopted under the authority created by the charter of the city, and that of itself would be sufficient to render it obligatory upon the grantee in the deed, and all others deriving title under it. It operated as a restraint upon the grant itself, for it was declaratory of its effect,

and as both the ordinance itself and the act referred to were passed before the execution of the original deed to the Farmers' Loan and Trust Company, they, so far as they apply, restrain the effect and operation of that conveyance. When it was made and delivered, it must accordingly be held to have been done in subordination to to this existing law relating to the subject-matter of the grant and the conveyance by which the property was transferred.

This property underlaid a portion of the water of the harbor of the city of New York, and its outer line was extended to a point where the interests and commerce of the city were believed to require the construction and maintenance of substantial piers. The work contemplated to be performed and the uses to be made of the land were matters of public interest which could be promoted and secured in no other way than by appropriate legislation, and it was to maintain that result that the ordinance mentioned in this act was adopted. Similar legislation of a general character had previously been enacted concerning the conveyance and use of lands lying under the navigable waters of the State. (1 R. S. [2d ed.], 194, 195; amended by chap. 283, Laws 1850.) And it had been the practice of the legislature, prior to the enactment of this act of 1845, to declare and prescribe the effect to be given to conveyances executed by public officials. In accordance with that policy the effect which deeds should have which might be given for the unappropriated land of the State, or upon sales made for the nonpayment of taxes, or under execution sales, or upon the foreclosure of mortgages, has been prescribed by the laws of the State, and no doubt has ever been entertained concerning the propriety of this legislation. If it can be sustained in one instance, where land is to be conveyed by persons exercising official authority, it can be in the others, for no reason is discovered upon which any practical distinction can be drawn by which one class of cases may be subjected to while another shall be excluded from the effects of such legislation. In transactions of this nature it has consequently been assumed that deeds executed pursuant to such authority must be so restrained as not to be allowed to transcend its terms. For that reason this ordinance was considered to be effectual in its restraints in the case of the *Mayor, etc.*, v. *Hart* (16 Hun, 380). It was a judicious exercise of authority for it related to a matter of great public importance;

and while it continued in effect, as it certainly appears to have been at the time when the deed to the Farmers' Loan and Trust Company was executed by the mayor of the city, it deprived him of the power to convey the title relieved of the restraint imposed by the terms of this ordinance. An effort has been made to construe the ordinance in such a manner as to exclude the filling made and the bulkhead erected by the plaintiff, but its terms are too clear to permit that construction. They are to the effect that the grant should not authorize the grantee to make land in conformity thereto without the permission of the common council, and when they are applied to this subject-matter it is quite clear that they were intended to prevent the land conveyed under the preceding authority of the ordinance itself from being filled in at the mere instance of the grantee. What was to be done in that respect was to be the subject of deliberate consideration and direction, so that it might be performed in such a manner as to promote the public interests as well as those of the grantee himself.

The restraint imposed prevented the deed from so operating as to confer a title upon the grantee which would allow him to fill in the land without the consent of the common council. It abridged the power of the city officials to convey the property free from that restriction. They were the agents of the city acting only under defined and limited authority, whose terms they could not exceed; and the party dealing with the mayor and the other officials of the city, was chargeable with knowledge of the terms by which this restriction had been imposed upon them. They were simply the agents of the city, and the party was bound to ascertain what was the extent and limits of their authority; and no greater rights could be acquired by dealing with them than that authority allowed them to create or convey (*North River Bank* v. *Aymar*, 3 Hill, 262; *Mechanics' Bank* v. *N. Y. and N. H. R. R. Co.*, 3 Kernan, 599), where it is in terms held to be a fundamental proposition that a principal is bound only by the authorized acts of his agent. (Id., 632; *Farmers', etc., Bank* v. *Butchers', etc., Bank*, 4 id., 623; S. C., 16 N. Y., 125; *Exchange Bank* v. *Monteath*, 26 id., 505; *President, etc.*, v. *Cornen*, 37 id., 320.)

This principle has been in express terms applied to the acts of officers of municipal corporations. They are required to keep

within the limits of the authority conferred upon them by law, and so far as they transcend such limits, their acts are void for want of authority, and parties dealing with them must at their peril acquaint themselves with the extent of the authority proposed to be exercised. (*Delafield* v. *State of Ill.*, 2 Hill, 160; *Hodges* v. *City of Buffalo*, 2 Denio, 110; Dillon on Mun. Corp. [2d ed.], § 381, and cases cited in note, Id., § 766; *Smith* v. *City of Buffalo*, 1 Sheldon, 493.)

When the filling-forming the subject of the complaint was placed in the water, the act of the plaintiff in putting it there was therefore subject to this prohibition contained in the sinking fund ordinance, and if it was placed there without the consent of the common council, then, as it was held by this court when the same controversy was before it upon the first occasion and substantially by the Court of Appeals, the plaintiff secured no right of recovery against the city because it had been carried out by means of the discharges from the sewer. In that view of the case the filling as well as the northerly bulkhead were placed upon the land in violation of the law, and out of that violation no right of action could properly accrue to the plaintiff.

In 1856 an ordinance was adopted providing for the filling of this and other land situated upon the easterly side of the city. By that ordinance it was proposed to extend the filling much further into the waters of the harbor than the line by which the plaintiff was governed in what he did. But this ordinance required that the filling which it provided for should be completed on or before the 1st day of January, 1860, and up to that time no title to this property had been vested in the plaintiff and no part of this filling had been made. But before that time the legislature deeming the importance of the subject to be such as to require its special attention, intervened and provided for the appointment of a commission, a part of whose duty it was to recommend the establishment of such exterior lines, in different parts of the East river along the water front of the city of New York, beyond which no erection or permanent obstruction of any kind could be permitted to be made. (Chap. 121, Laws 1855, sub. 3, § 1.) And pursuant to the recommendations of this commission, the legislature afterwards prescribed that exterior line in front of this land. (Chap. 763, Laws 1857.) That limit appears to be different from the one men-

tioned in the ordinance of 1856, thereby abrogating the provisions made upon the subject by the ordinance. It provided a complete system in and of itself, and necessarily, therefore, superseded the ordinance. (*Heckmann* v. *Pinkney*, 81 N. Y., 211, 215, 216.) This act prohibited earth, stone or other solid material from being placed in the waters of the port beyond the bulkhead line, or line of solid filling established by its provisions. But it contained nothing prescribing when or under what regulations the filling up to that line should be made, and the consequence of that omission was to leave the preceding ordinance of 1844, sustained as it was by the act of 1845, still in force, and applicable to the property in controversy. Nothing was provided by this legislation, under which the harbor line was established, in any manner inconsistent with this ordinance, and for that reason the latter was neither abrogated nor limited by such legislation.

In July, 1867, written permission was given to the plaintiff by the street 'commissioner to build a bulkhead on the harbor commissioner's line, foot of Thirty-fifth street, East river, but it was further stated that the same was not to be filled in behind until that was directed by the superintendent of wharves. This permission, however, was not that which the ordinance provided should be obtained before filling should be placed in the water, for it was not given by or under the authority of the common council, which possessed, under the ordinance, exclusive jurisdiction over this subject. And it was held to be ineffectual as authority for the filling of this land when this cause was first before the General Term, and also upon its reconsideration after a second trial of the issues had taken place.

But even if the permission had been authorized, it was not broad enough to legalize the act of the plaintiff in filling in the land, or constructing the bulkhead, which was carried away by the water, for it simply authorized him in terms to build a bulkhead on the commissioner's line at the foot of Thirty-fifth street, which clearly did not include either front or the northerly side of the land described in his deed; and in addition to that he was prohibited from filling in behind the bulkhead until he was directed so to do by the commissioner of wharves, and no direction of that kind appears to have ever been given to him.

Certainly the plaintiff at no time received any permission from the common council to make the land which was carried out by the flowage from the sewer. What he did for that purpose was therefore without authority, and the fact that it was afterwards washed out by the sewer, whose existence had been observed by him before any part of the work had been done, created no right of action in his favor against the defendant. Other points have been presented in the case, but as those already considered are regarded as controlling its disposition, they do not now require attention. As the case has been considered the judgment recovered should be reversed, and a new trial ordered, with costs to abide the event.

DAVIS, P. J., concurred; BRADY, J., concurred in the result.

Judgment reversed, new trial ordered, costs to abide the event.